# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY D. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:05CV53ERW/MLM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action brought pursuant to Title 42 U.S.C. § 405(g) for judicial review of the final

decision of Jo Anne Barnhart ("Defendant") denying the application for Social Security benefits under

Title II of the Social Security Act, 42 U.S.C. § 401 et. seq. filed by Plaintiff Larry D. Anderson

("Plaintiff"). Plaintiff has filed a brief in support of his Complaint. Doc. 14. Defendant has filed a

brief in support of her Answer. Doc. 15. This matter was referred to the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636 (b)(1). Doc. 3.

## I.
## PROCEDURAL HISTORY

Plaintiff filed his application for disability benefits on October 21, 2002, alleging that he was

disabled as of April 12, 2002, due to post traumatic stress disorder ("PTSD"). (Tr. 75-77). Plaintiff's

application was denied.[1] (Tr. 56-60). Pursuant to Plaintiff's request for a hearing, a hearing was held

---

[1]    Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. See 20 C.F.R. § § 404.906 and 404.966 (2002). These modifications include, among other things, the elimination of the reconsideration step and at times, the elimination of the Appeals Council review step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from her initial denial of benefits to the administrative law judge level.

before Administrative Law Judge ("ALJ") Peter Baum on February 5, 2004. On February 23, 2004, the ALJ issued his decision finding that Plaintiff was not under a disability through the date of the decision. (Tr. 12-20). On June 30, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 5-8). As such, the decision of the ALJ stands as the final decision if the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that he completed the twelfth grade; that he worked in the plant at A.P. Green for almost thirty-one years; that while working there he was primarily a "brick boxer"; that this job involved unloading bricks off of a car and putting the bricks into a box; that this job also involved counting and measuring bricks and talking to other employees; that the plant at A.P. Green closed on April 12, 2002; that after the plant closed he worked as a "sacker" while the company was in the process of shutting down; that as a sacker he hand weighed sacks which often weighed fifty pounds; that once in awhile he had help pick up 100 pound sacks; and that he stopped working for A.P. Green in May 2002. (Tr. 34-42). Plaintiff also testified that while at A.P. Green he did janitorial work. (Tr. 40).

Plaintiff said that if he had been called back to A.P. Green after May 2002 it is "hard to say" whether he would have been able to work there because his post-traumatic stress disorder ("PTSD") had gotten progressively worse and because he was sleeping less at night.(Tr. 38). Plaintiff said when he last worked at A.P. Green he was having trouble getting along with people and that this problem would have prevented him from going back to work at A.P. Green. (Tr. 40). He further said he did not know of any problems other than symptoms from his PTSD which would affect his ability to go back to work; that he has hearing aids in both ears which he did not wear to work due to dust; that

2

he had trouble at work hearing without the hearing aids; and that the hearing aids "make all the difference in the world." (Tr. 43, 53).

Plaintiff testified that at the time of the hearing he did not drink "very much" and that he had slowed down; that two weeks prior to the hearing he went for a week without a drink; that he drinks beer; and that doctors have told him not to drink because he has a piece of shrapnel in his liver and because of the medication he takes. (Tr. 44).

Plaintiff further testified that in September 2002 he told a VA doctor that he was having more problems with flashbacks because he was not working; that when he was working this problem was "pretty much the same"; that he had trouble sleeping for "30 plus years"; and that he cried from his memories of Vietnam. (Tr. 46-47).

Plaintiff testified that Dr. Carter has treated him for PTSD and that he was scheduled to see a doctor at the VA hospital. He also testified that he was prescribed Zoloft; that he was initially prescribed twelve milligrams of Zoloft; and that when the dosage was raised to fifty milligrams he had some bad side effects including loss of appetite and insomnia. (Tr. 49). Plaintiff also said that since he stopped working he drives to Mexico, Missouri, and to Clark, Missouri, to see his mother once in awhile. (Tr. 49). He further said that he does not "feel safe out there on the highway. I have a fear of being in a bad wreck or getting lost. Stress." (Tr. 50). Plaintiff testified that when he goes to Wal-Mart or the grocery store it "bothers me. Strangers bother me." (Tr. 49). He also testified that he has a startle reflex; that when a loud noise goes off it makes him jump; that when he was in the VA hospital there was a sign over his bed which said "do not startle"; that he hunts whitetail deer in season; and that the gunshots do not bother him when he goes hunting. (Tr. 50-51).

# III.
# MEDICAL RECORDS

Records of Columbia Orthopaedic Group reflect that Plaintiff was seen on June 3, 1986, at which time it was noted that Plaintiff had torn right meniscal cartilage and that he was scheduled for arthroscopy the next day. (Tr. 198).

Ben Lee Jolly, M.D., reported that he saw Plaintiff on January 24, 1990, for complaints of pain in his neck; that he saw Plaintiff on February 23, 1990, for complaints of pain in his upper back into his right shoulder and that Plaintiff was doing much better; and that he saw Plaintiff on November 2, 1990, for complaints of aching in his legs and that he was "doing fine at this time and there is no need for treatment." On each of these dates Dr. Jolly reported that he recommended medications for Plaintiff. (Tr. 150).

Dr. Jolly's records reflect that he saw Plaintiff on February 25, 1991; that Plaintiff was not tender on this date; and that Dr. Jolly recommended that Plaintiff try anti-inflammatory medication. (Tr. 147).

On August 26, 1991, plaintiff was seen at the Audrain Medical Center Emergency Room with complaints of right scapular pain. Plaintiff's diagnosis was somatic dysfunction. (Tr. 145).

An x-ray report of August 26, 1991, states that the impression was normal examination of the right shoulder and normal examination of the thoracic spine. (Tr. 148).

Dr. Jolly reported on September 3, 1991, that Plaintiff was still complaining of pain in his right scapular region; that he injected Plaintiff on this date; and that Plaintiff was prescribed Amitriptylene. (Tr. 147).

On December 30, 1991, Plaintiff was seen at the Audrain Medical Center Emergency Room for complaints of left foot pain. His diagnosis on this date was arthritis left first metacarpal phalangeal joint. (Tr. 144).

Dr. Jolly reported on May 8, 1992, that Plaintiff complained of pain in the midline of the L-S junction with no radicular symptoms. Dr. Jolly prescribed Amitriptyline and Voltaren on this date. (Tr. 147).

Records of the Harry S. Truman VA Medical Center reflect that Plaintiff was admitted on February 23, 1994, and discharged March 17, 1994; that he had been admitted for rehabilitation at another facility about fifteen years earlier; that Plaintiff reported daily "flashbacks and nightmares" and insomnia; and that x-rays of the thoracic spine showed that Plaintiff had minimal degenerative changes at L3-4 and L4-5. Upon discharge, Plaintiff's diagnosis was at Axis I: Alcohol dependence, PTSD; at Axis III, gout; at Axis IV, Mild; and at Axis V, 90-81. (Tr. 199-202).

On October 10, 1995, Dr. Jolly reported that Plaintiff presented with pain in his right shoulder; that he fell at work; that Plaintiff continued to have crepitance on range of motion ; that the was treated with physical therapy; and that x-rays taken on this date were negative. (Tr. 147).

Dr. Jolly's records further reflect that Plaintiff was seen on January 29, 1996, for evaluation of his right shoulder; that he was having no pain on this date and had full range of motion; and that Plaintiff had a five percent permanent partial impairment rating of the shoulder as a whole. Dr. Jolly reported that he injected Plaintiff's right shoulder on November 25, 1996 and on May 6, 1997. (Tr. 146).

Plaintiff was seen at the VA Hospital on January 15, 1999, on which date he reported that his "sense of depression is continual"; that he had problems with sleep and had continual nightmares; that he no longer had problems with alcohol; that he only drinks beer on week-ends; that he has "up to a 12-pack on a particular night"; that he had no problems with his employment; and that he did "not wish a referral to MHC." (Tr. 204).

Records of the VA Hospital reflect that Plaintiff was seen on September 8, 2000; that his diagnosis was depression; that Plaintiff denied suicidal tendencies; and that he stated that he had depression only for short intervals under one day, that he had difficulty sleeping, and that his gout was controlled. (Tr. 156).

Plaintiff was seen at the Audrain Medical Center Emergency Room on December11, 2000, for removal of a bone spur on the right foot. (Tr. 143). Plaintiff was seen at the Audrain Medical Center Emergency Room on December 31, 2001, on which date x-rays of the left foot showed minimally displaced minimally angulated fracture of the distal second, third, and fourth metatarsal. The diagnosis was a fractured metatarsal. (Tr. 138).

Records of Audrain Medical Center, dated April 1, 2002, reflect that an MR arthrogram of the right shoulder showed that Plaintiff had a large complete tear of the rotator cuff with retraction of the supraspinatus tendon under the acromion. (Tr. 134).

Dr. Jolly reported that on April 15, 2002, at Audrain Medical Center, Plaintiff underwent an arthroscopic examination with open rotator cuff tear repair and that Plaintiff tolerated the procedure well without complication. (Tr. 131-32).

Dr. Jolly's records reflect that he saw Plaintiff on April 29, 2002, for follow-up of his rotator cuff tear and that Plaintiff was referred to physical therapy. (Tr. 161). On May 20, 2002, Dr. Jolly noted that Plaintiff was to work on his range motion exercises. (Tr. 161). On June 17, 2002, Dr. Jolly noted that Plaintiff's shoulder was improving on range of motion and that he still lacked some external rotation. (Tr. 160). On July 9, 2002, Dr. Jolly noted that Plaintiff was doing very well and was "still lacking slight external and internal rotation, otherwise he is doing well." (Tr. 160). On August 6, 2002, Dr. Jolly noted that Plaintiff had almost full range of motion of his shoulder with good strength and that he would return back to work as tolerated. (Tr. 160).

Jeffrey Thiele, M.D., conducted a psychiatric evaluation of Plaintiff on September 13, 2002,[2] for a Veteran's Administration Compensation and Pension Exam Report. (Tr.166-171). Dr. Thiele noted that Plaintiff had been examined in December of 1993, at which time he was diagnosed with PTSD, dysthymia, and alcohol abuse and that Plaintiff had no ongoing outpatient psychiatric treatment. Dr. Thiele reported that Plaintiff stated that he had multiple intrusive memories about his experiences in Vietnam; that when he worked it kept his mind occupied and he had fewer intrusive memories; that he had difficulty sleeping; that he typically slept two hours per night and, on a good night, he slept as much as three or four hours; that he suffered from nightmares about his experiences in Vietnam; that he is irritable and has a difficult time getting to know people; that he does not like to drive in traffic and fears getting lost; that he was sometimes awakened by the nightmares; that he tended to sleep better when he drank alcohol which provided temporary relief from the insomnia; that he lost his job the prior spring when his employer declared bankruptcy; that since he lost his job he had been drinking three out of seven days; that he has problems with his memory and focusing; that since being unemployed he is more moody and depressed; and that he had a driving while intoxicated conviction in 1998. (Tr. 167-69). Dr. Thiele further reported that:

> [Plaintiff's] increase in symptoms is not purely related to his more recent job loss as he indicated on several occasions, different symptoms began to become worse three to four years ago which preceded the job loss. He also indicates that he has become more aware of his symptoms with the unemployment as he is no longer able to use employment as a way to not think about his experiences and to avoid thinking about them.

(Tr. 171).

Dr. Thiele reported that Plaintiff was alert and cooperative; that his memory was intact for recent events; that his speech was normal; that he denied hallucinations or delusions other than those

---

[2]     Dr. Thiele's report is dated September 19, 2002, although he conducted the examination of Plaintiff on September 13, 2002.

associated with flashbacks; and that he admitted to having had suicidal ideation, particularly since he had been unemployed, and did not have any plan or intent. Dr. Thiele also reported that he suggested to Plaintiff that he consider coming back to the VA for ongoing treatment of his PTSD and that he have his hearing re-evaluated. Dr. Thiele's diagnosis was at Axis I, PTSD, chronic, dysthymic disorder, alcohol abuse, episodic; at Axis II, no diagnosis; at Axis III, tinnitus, hearing loss, and gout; and at Axis IV, primary support, economic problems. Dr. Thiele reported that at Axis V, with regards to Plaintiff's PTSD, "I would rate him at 47. With regards to the dysthymic disorder, I would rate him at 57 and with regards to the alcohol abuse, I would rate him at 60." (Tr.167-71).

Rita Esterly, Ph.D., completed a Psychiatric Review Technique form on December 2, 2002. Dr. Esterly reported on this form that Plaintiff's affective disorder, anxiety-related disorder, and substance addiction disorder are not severe and that Plaintiff has no limitations in regard to activities of daily living and no repeated episodes of decompensation, and that he has mild limitations in regard to difficulties in maintaining social functioning and concentration, persistence or pace. Dr. Esterly stated that Plaintiff worked for thirty years with PTSD and admitted to a counselor that he would still be working if the plant had not closed. Dr. Esterly concluded that, "[t]he medical evidence does not support a history of functional limitations; therefore, his allegation is not credible." She further concluded that Plaintiff has the "ability to understand, remember, and carry out simple instructions, to make simple work related decisions, to relate appropriately to coworkers and supervisors, and to adapt to most usual changes in the work environment as evidenced by his performance on the exam." (Tr. 172-185).

A Physical Residual Functional Capacity Assessment completed on December 10, 2002, by Kim W. Miller, states that Plaintiff can lift fifty pounds occasionally and twenty-five pounds frequently; that he can stand and/or walk about six hours in an 8-hour workday; that he can sit with

normal breaks about six hours in an 8-hour workday; and that he has unlimited ability to push and/or pull. Evaluator Miller further found that Plaintiff is limited to occasionally balancing and crawling. In regard to Plaintiff's ability to reach in all directions, Evaluator Miller checked both the limited and unlimited boxes. This evaluator found that Plaintiff had no communicative or environmental limitations. (Tr. 186-93).

Jennifer L.K. Clark, M.D., reported that she saw Plaintiff on July 29, 2003, with complaints of "a knot on the top of his right foot" which had been there for years. Dr. Clark's records reflect that Plaintiff brought x-rays of his left foot which were unremarkable; that the right foot showed moderate to severe osteoarthritis of the midfoot; that Plaintiff could walk a mile and sit for an hour and a half; that the "foot really doesn't bother him; that her diagnosis was osteoarthritis of the mid-foot; that she told Plaintiff that if was not hurting she would not recommend doing anything; and that she showed him how to lace his shoes. (Tr. 194)

In a letter to Plaintiff's attorney, Bruce Harry, M.D., a forensic psychiatrist, wrote on January 27, 2004, that he examined Plaintiff on September 2, 2003, and October 4, 2003, for a total duration of three and a half hours. Dr. Harry reported that he administered the Detail Assessment of Posttraumatic Stress("DAPS") and the Shipley Institute of Living Scale ("Shipley"). (Tr. 206). Dr. Harry further reported that Plaintiff described in detail his experience in Vietnam, the effect of that experience on him, and that "[t]here ain't a day that goes by that I don't think about Vietnam. And, when I go to sleep I think about it again. I have flashbacks. I worry about everyday life. I have stress, you know." (Tr. 213). Dr. Harry reported that Plaintiff said that he arises in the morning, bathes, showers, dresses, grooms himself; that he goes three days without shaving; that he walks to visit his sister in the morning spending about thirty to sixty minutes with her; that he then walks home; that he might watch television and/or clean house; that he does whatever needs to be done including

laundry, linens, windows, vacuuming, and mail; that he seeks assistance at the bank for balancing his checkbook; that in good weather he goes fishing, hunts deer with a rifle, and puts out a small garden; that in regard to hunting Plaintiff said that as long as he can go hunting and not see the enemy out there, he will continue hunting; that he sees friends at least once a week and sees some of his friends two to three times a week; that sometimes he plays cards, talks, or goes fishing with friends; that he had a girlfriend for the last four months; that he has trouble concentrating on anything for long periods; that it takes him about an hour to an hour and a half to clean the house; and that he cannot work because of a right rotator cuff injury. Dr. Harry further reported that Plaintiff "told me that his mental health had not gotten better over the last few years and, 'I guess I've stayed about the same.'" (Tr. 216).

Dr. Harry reported that mental examination showed that Plaintiff was oriented to person, place, time, and circumstance; that his immediate recall was intact; that his recent memory was at least moderately impaired; that his remote memory was intact; that he had impaired attention and concentration and was distractible; that his motor activity was agitated; that his mood was anxious and sad; that his thoughts were formed without associative disturbance; that he did not have any obsessions, overvalued ideas, bizarre delusions, or compulsive behaviors; that he was not suicidal, self-endangering, homicidal, or other endangering; and that his intellect was average; and that his insight and judgment were verbally intact. (Tr. 217).

Dr. Harry's assessments include a Shipley Cognitive Quotient of 97 and an Estimated WAIS-R Full Scale IQ of 93. (Tr. 217). Dr. Harry reported that his testing in regard to PTSD indicated a broad range of symptoms "which are marked severity and duration, his overall protocol is invalid because he endorsed a statistically high number of unusual phenomena." (Tr. 217). Dr. Harry further

reported that Plaintiff had GAF [3] of 51. (TR 218). He also stated that overall he rated Plaintiff's abilities to do activities of daily living as mildly impaired, his socialization as moderately to markedly impaired, and his concentration, persistence and pace as moderately to markedly impaired. He noted that Plaintiff's mental health has continued to decline; that his mental conditions alone would not necessarily prevent him from holding gainful employment; that "in combination with his mounting physical conditions those same mental conditions of PTSD and Dysthmic Disorder significantly limit his abilities to compensate for those physical conditions such that he could not sustain gainful employment." (Tr. 218).

Dr. Harry completed a Medical Assessment of Ability to do Work-Related Activities (Mental), and reported that Plaintiff was poor to none in the categories of relating to co-workers, dealing with the public, interacting with supervisors, dealing with work stresses, maintaining attention and concentration, behaving in an emotionally stable manner, and relating predictably in social situations; that Plaintiff was fair in the categories of using judgment and demonstrating reliability; and that he was good in the categories of following work rules and functioning independently, understanding, remembering, carrying out detailed but not complex instructions, and maintaining personal appearance; very good in the category of remembering and carrying out simple job instructions; and good to fair in the category of understanding, remembering, and carrying out complex job instructions. (Tr.220-21).

---

[3] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," and scores of 61 to 70 represent "mild," Scores of 90 or higher represent absent or minimal symptoms or impairment. Id. at 32.

# IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 788, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § § 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national

economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's

conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir.

1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

## V.
## DISCUSSION

As stated above, the issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff is not disabled. Onstead, 962 F.2d at 804. The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1991). Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

In the matter under consideration Plaintiff contends that the ALJ committed reversible error by failing to make a finding concerning Plaintiff's residual functional capacity ("RFC") which was supported by substantial evidence; that the ALJ's findings regarding Plaintiff's RFC are "completely contrary to the evidence"; that the ALJ improperly relied on the report of a non-examining physician; that the ALJ should have followed the reports of Dr. Thiele and of Dr. Harry; that the ALJ should

not have relied on the finding of Dr. Esterly that Plaintiff's allegations were not credible; and that the ALJ's reliance on Plaintiff's statement that he deer hunts is flawed.

The ALJ found pursuant to the sequential analysis that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 12, 2002. Pursuant to the sequential analysis the ALJ next found that Plaintiff's physical impairments are not severe and that his mental impairments of PTSD, dysthymic disorder, and alcohol abuse are severe. The ALJ concluded that Plaintiff's impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; that Plaintiff's allegations regarding his limitations are not totally credible; that Plaintiff has the RFC to perform unskilled work which involves no more than minimal contact with the public; and Plaintiff's past work as a brick yard worker (brick boxer) does not require the performance of work-related activities precluded by his RFC. (Tr. 20). Further, in regard to Plaintiff's RFC, the ALJ concluded that Plaintiff had no exertional limitations. (Tr. 18).

The ALJ also found, in regard to Plaintiff's alleged mental impairments, that:

In this case, the relevant signs, symptoms and findings associated with the claimant's severe mental impairment have been reviewed in relation to the criteria in § § A and B of Appendix 1. The evidence shows that claimant's functional limitations are mild restrictions of activities of daily living, mild to moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no reported episodes of decompensation. These conclusions are largely consistent with the assessments of the state agency physician.

Accordingly, I conclude that the claimant's mental impairments limit him to unskilled work that involves no more than minimal contact with the public. The claimant has no severe physical impairment of 12 months or more duration and that the only reason he has been unable to continue past relevant work as a brick boxer is because the plant closed.

(Tr. 19).

**A.  Opinions of Doctors**:

Plaintiff contends that the ALJ erred in not following the reports prepared by Dr. Thiele, who conducted a psychiatric examination of Plaintiff, and by Dr. Harry,[4] a forensic psychiatrist, who also examined and evaluated Plaintiff.   Additionally, Dr. Esterly, a psychologist, who did not examine Plaintiff, provided her opinion regarding Plaintiff's alleged mental disability.  The record does not reflect that Plaintiff received ongoing treatment for his mental impairments.  As such, there are no records from a treating doctor in regard to Plaintiff's mental impairments.

The opinions and findings of a plaintiff's treating physician are entitled to considerable weight.  Indeed, if they are not controverted by substantial medical or other evidence, they are binding.  Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000)(citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)).  See also Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing  Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).  20 C.F.R. § 404.1502 provides as follows in regard to whether a source is a treating, non-treating, or non-examining source:

> Nonexamining source means a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case. At the administrative law judge hearing and Appeals Council levels of the administrative review process, it includes State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult. See § 404.1527.
>
> Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing

---

[4]        The court notes that the ALJ referred to Dr. Bruce Harry as Dr. Bruce.

treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source. See § 404.1527.

...

Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

It is the ALJ's role to resolve conflicts among medical sources who reach conflicting conclusions. Bently v. Shalala, 52 F.3d 784, 786-87 (8th Cir. 1995) This is true even when the medical evidence is equally balanced. Id. at 787. "[T]he ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole." Id. (citing Bland v. Bowen, 861 F.2d 533, 535 (8th Cir.1988) (refusing to revisit ALJ's resolution of conflicting psychological evaluations); Fulton v. Heckler, 760 F.2d 1052, 1056 (10th Cir.1985) (refusing to credit psychiatric evaluation which did not comport with claimant's medical history). Further, where there are conflicts internal to one expert's opinion, it is likewise the role of the ALJ to resolve these conflicts. Clay v. Barnhart, 417 F.3d 922, 930 (8th Cir.2005).

Pursuant to the definitions provided by the Regulations neither Dr. Thiele or Dr. Harry are treating physicians as neither of these doctors saw Plaintiff on more than one occasion. Dr. Thiele saw Plaintiff for purposes of preparing a VA Compensation and Pension Exam Report and Dr. Harry

saw Plaintiff on a consulting basis for the purpose of preparing a report which was sent to Plaintiff's attorney. Significantly, Dr. Harry advised Plaintiff that "the usual physician-patent and psychiatrist-patient relationships" did not exist between Dr. Harry and Plaintiff. (Tr. 207). Because neither Dr. Thiele nor Dr. Harry are treating doctors, their opinions are not entitled to controlling weight. See Cunningham, 222 F.3d at 502.

The ALJ considered the opinions of both of Dr. Thiele and Dr. Harry as well as the opinion of the non-examining psychologist, Dr. Esterly. While the ALJ's conclusions are consistent with those of Dr. Esterly, the ALJ did consider the content of both Dr. Thiele's and Dr. Harry's reports. The court notes that Dr. Thiele's report consists primarily of Plaintiff's self-reporting of the manifestations of his PTSD. See Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993) (holding that the ALJ was justified in discrediting the conclusory opinion of disability by a treating physician on ground that it was based solely on the claimant's subjective complaints and was not supported by other findings). Moreover, Dr. Thiele concluded that Plaintiff was alert, that his memory was intact for recent events, that Plaintiff was capable of managing his finances, and that his insight and judgment were fair. Thus, to the extent that Dr. Thiele's report suggests that Plaintiff is unable to work, his conclusion is inconsistent with his own findings and the ALJ, therefore, properly discredited his conclusion. See Clay, 417 F.3d at 930.

Further, Dr. Thiele recommended to Plaintiff that he consider treatment at the VA for his PTSD. The record does not reflect that Plaintiff received or sought such treatment. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment is inconsistent with a finding of disability). Moreover, the ALJ considered that in 1999 when seen at VA Plaintiff indicated that he did not want treatment for his mental disorders. See Bently, 52 F.3d at 786 (8th Cir. 1995) (holding that the plaintiff's failure to seek medical treatment

supported the ALJ's decision that Plaintiff was not disabled); Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (holding that failure to seek aggressive treatment is not suggestive of disabling pain); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991) (holding that seeking limited medical treatment is inconsistent with claims of disabling pain).

The ALJ considered that Dr. Harry concluded that Plaintiff's mental conditions would not necessarily prevent him from holding gainful employment and that Dr. Harry also said that if Plaintiff's mental conditions are considered in combination with Plaintiff's physical conditions Plaintiff could not sustain gainful employment. Upon finding that Plaintiff is not disabled and upon discrediting Dr. Harry's conclusion, the ALJ noted that Plaintiff's rotator cuff surgery was successful and did not result in any limitations and that, although Plaintiff had hearing loss and tinnitus, his hearing was within normal limits. In regard to Dr. Harry's conclusion that Plaintiff was unable to work when his physical impairments are considered in conjunction with his mental impairments, a physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, to the extent that Dr. Harry's report addresses the effects of Plaintiff's physical condition, Dr. Harry's conclusion in this regard is not only conclusory but it is not consistent with the medical evidence of record as discussed above. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). Moreover, Dr. Harry is a psychiatrist and did not treat Plaintiff for his physical injuries as did Dr. Jolly. See Loving v. Dept. of HHS, 16 F.3d 967, 971 (8th Cir. 1994) (holding that an ALJ

is justified in rejecting the opinion of a physician because the opinion was outside the scope of his expertise and because the physician did not submit any objective medical evidence in support of his conclusions). The court finds that upon the ALJ's resolving conflicts between the opinions of doctors the ALJ was properly executing his role. See Estes, 275 F.3d at 725. The court further finds that the ALJ's consideration of the records and opinions of Dr. Thiele, Dr. Harry, and Dr. Esterly is consistent with the Regulations and case law and that his resolution of conflicts arising from their opinions is based on substantial evidence on the record as a whole.

**B.    Plaintiff's RFC:**

Plaintiff contends that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence. The ALJ concluded that Plaintiff's mental impairments limit him to unskilled work that involves no more than minimal contact with the public. The ALJ also considered that Plaintiff has no severe physical impairment of twelve months or more duration. The ALJ concluded, therefore, that Plaintiff had the RFC to perform his past relevant work as a brickyard worker.

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam). The mere existence of a mental condition, however, is not per se disabling. Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981).

20 C.F.R. § 404.1520a(a)(2) provides that the special technique applicable to mental disorders includes consideration of the functional consequences of the mental disorder(s) relevant to a claimant's ability to work. 20 C.F.R. § 404.1520a(b)-(d) further provides, in relevant part, that:

(b)  Use of the technique:

(1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). ... If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

...

(c) Rating the degree of functional limitation.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. ...

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) Use of the technique to evaluate mental impairments. After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

...

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity..

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC

is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). At step 4 of the sequential analysis a claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). To meet the Regulation's definition of disabled a claimant must not only have a medically determined impairment which can be expected to last for a continuous period of not less than twelve months, but a claimant must have a severe impairment which makes him unable to do his past relevant work. 20 C.F.R. § 404.1505(a). An ALJ must use the determination of a claimant's RFC to determine if the claimant can perform his or her past relevant work. Id. Only if the ALJ concludes that a claimant cannot perform his or her past relevant work does § 404.1505(a) require that the ALJ consider whether the claimant can perform other work. Id.

Upon determining Plaintiff's RFC and concluding that Plaintiff has no severe physical impairment, the ALJ considered that Plaintiff underwent rotator cuff surgery. He did not, however, specifically address medical records in regard to this surgery nor did he address records relating to Plaintiff's complaints of foot pain. This failure does not suggest that this aspect of Plaintiff's claim was not considered. See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"). The court notes that Dr. Jolly reported in June 2002 that Plaintiff's

shoulder was improving after surgery and exercise and that he reported in August 2002 that Plaintiff had almost full range of motion. The record, moreover, does not establish that Plaintiff received treatment for his rotator cuff injury after August 2002. See Rautio, 862 F. 2d at 179; Nelson, 946 F.2d at 1317; James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). The court finds that the ALJ's conclusion that Plaintiff does not have a severe physical impairment is supported by substantial evidence on the record.

As stated above, the ALJ concluded that Plaintiff's mental impairments, including PTSD, dysthymic disorder, and alcohol abuse, are severe. The ALJ then considered Plaintiff's mental impairments in terms of the criteria set forth in §404.1520a(c)(3); he concluded that Plaintiff's restrictions are mild in the area of daily living, mild to moderate in regard to social functioning, mild in regard to maintaining concentration, persistence an pace, and concluded that he had no episodes of decompensation. Indeed, after reviewing Plaintiff's medical records, including Dr. Thiele's report, Dr. Esterly described Plaintiff's restrictions in a manner consistent with those found by the ALJ. Dr. Esterly further concluded that Plaintiff has the ability to understand, remember, and carry out simple instructions, to make simple work related decisions, to relate appropriately to coworkers and supervisors, and to adapt to most ususal changes in the work environment. The court notes that Dr. Harry reported that Plaintiff said he showers, dresses and grooms himself; that he walks to visit his sister; that he cleans the house, including vacuuming, linens, and windows; that he puts out a small garden; and, as more fully set forth below, that he hunts and fishes. Dr. Harry reported upon examination that Plaintiff was oriented to person, place, and time; that his immediate recall was intact; that his thoughts were formed without associative disturbance; that he did not have compulsive behaviors; that he was not suicidal, self-endangering, or other endangering; and that his insight and

judgment were intact. The court finds, therefore, that the decision of the ALJ in regard to the criteria set forth in §404.1520a(c)(3) is based on substantial evidence on the record.

Pursuant to §404.1520a(d)(3), after determining that Plaintiff's mental impairment was severe, the ALJ determined Plaintiff's RFC. Taking Plaintiff's limitations into consideration the ALJ concluded that Plaintiff has the RFC for unskilled work that involves no more than minimal contact with the public. This analysis of the ALJ is consistent with the requirements of § 404.1520a.

Pursuant to the Regulations, 20 C.F.R. § § 416.920(e), 404.1520(e), the ALJ next considered whether Plaintiff's RFC precluded his performing his past relevant work and concluded that Plaintiff's RFC does not preclude his performing his past work in the brick yard. As such, the ALJ was not required to proceed further with the sequential analysis. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) ("If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."). The court finds, therefore, that the ALJ's determination of Plaintiff's RFC and the ALJ's determination that Plaintiff's RFC enables him to perform his past relevant work are consistent with the Regulations and that these conclusions are based on substantial evidence on the record.

## C. Plaintiff's Activities:

Plaintiff contends that the ALJ improperly considered and/or misconstrued Plaintiff's testimony that he deer hunts. First, the court notes that Plaintiff's hunting was not determinative of whether or not he is disabled. It was only one factor considered by the ALJ in resolving Plaintiff's credibility. Second, the ALJ considered that Plaintiff acknowledged at the hearing that he deer hunts and that other hunters fire their weapons within earshot. As noted by the ALJ, Plaintiff told Dr. Thiele that he has startle responses to loud noises. (Tr. 18). The ALJ further acknowledged the inconsistencies with Plaintiff's being able to hunt and his statement that he is startled by loud noises.

While Plaintiff explained at the hearing that gunshots do not bother him when he hunts, the ALJ properly considered that Plaintiff hunted. A claimant's daily activities can be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disability "may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's hunting upon choosing to discredit his complaints. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Also, upon concluding that Plaintiff's complaints were not entirely credible, the ALJ considered other factors as suggested by Polaski. In particular the ALJ considered that Plaintiff stopped working because the plant in which he was working shut down. Such evidence is properly considered by an ALJ. Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003).

The ALJ also considered that Plaintiff continued to drink despite medical advice to the contrary. Brown, 87 F.3d at 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain).

The court finds that the ALJ credibility resolutions are consistent with the Regulations and case law and that the ALJ's decision in this regard is supported by substantial evidence on the record as a whole.

## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in his Brief in Support of Complaint be **DENIED.** [14]

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 2nd day of  May, 2006.     UNITED STATES MAGISTRATE JUDGE